UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

SONNY M. DAVIS,

  Plaintiff,

  v.            CAUSE NO: 3:17-CV-4-JD-MGG

GREG SHEWARD and DR. LIAW,

  Defendants.

OPINION AND ORDER

  Sonny Davis, a prisoner without a lawyer, is proceeding in this case on claims against two remaining defendants. Discovery has concluded and each defendant filed a separate summary judgment motion. ECF 169 and 173. Davis filed a single response to the motions. ECF 182. The defendants filed separate replies. ECF 186 and 187. These motions are now fully briefed.

  Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party

and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Summary judgment "is the put up or shut up moment in a lawsuit . . .." *Springer v. Durfiinger*, 518 F.3d 479, 484 (7th Cir. 2008).

## I. CLAIMS AGAINST GREG SHEWARD

When the amended complaint was screened pursuant to 28 U.S.C. § 1915A, Davis was granted leave to proceed "against Greg Sheward in his individual capacity [on two claims] for compensatory and punitive damages [(1)] for denying him a gluten-free diet from June 15, 2015, until July 14, 2015, and [(2)] for serving him insufficient quantities of spoiled food from July 14, 2015, until January 2016 in violation of the Eighth Amendment . . .." ECF 47 at 4.

> The Eighth Amendment places both restraints and duties on prison officials, and one of those duties is to ensure that inmates receive adequate food. In order for a prison official to be liable under the Eighth Amendment, two requirements must be met. First, the inmate must demonstrate that the deprivation suffered was, objectively, "sufficiently serious." . . .
> Second, the inmate must demonstrate that the prison official had a sufficiently culpable state of mind. In a case involving prison conditions, that state of mind is deliberate indifference to inmate health or safety.

*Williams v. Shah*, 927 F.3d 476, 479–80 (7th Cir. 2019) (citations omitted).

A. Gluten-free Diet Claim

Davis was granted leave to proceed on a claim against Sheward for being denied a gluten-free diet from June 15, 2015, to July 14, 2015. ECF 47 at 4. However, his affidavit filed in response to the summary judgment motion narrows those dates. Davis declares in his Affidavit, "I was not provided a gluten-free diet from June 17, 2015, through July 8, 2015 . . .." ECF 182-3 at 3. Therefore, those are now the relevant dates for this motion.[1] There is no dispute Davis did not receive a gluten-free diet during these dates. There is no dispute Davis had been receiving a gluten-free diet before June 17, 2015. Davis is a Muslim who celebrates Ramadan by fasting during daylight hours. ECF 182-3 at 2. During Ramadan, Muslim inmates receive sack meals. In 2015, Ramadan began on June 17. That was the first day Davis received sack meals. *Id*. at 2.

Sheward argues he was not deliberately indifferent to Davis' need for a gluten-free diet. Davis argues Sheward knew he required a gluten-free diet. There is a dispute about when Sheward knew Davis was not receiving a gluten-free diet. Davis declares in his affidavit, "I filed an informal grievance to Aramark [and] received Greg Sheward's response on June 24, 2015." ECF 182-3 at 3. Sheward affirms in his Supplemental Declaration, "I sent that correspondence to [Davis] on July 7, 2015 . . .." ECF 187-1 at 1. The response itself is undated. *See* ECF 182-3 at 15. Construed in the light most favorable to Davis, Sheward knew he was not receiving a gluten-free diet on June 24, 2015, but only because the food provided included cookies.

---

[1] Davis also declares, "I was only given an extremely small amount of food from July 8, 2015, through July 16, 2015." ECF 182-3 at 3. However, that is beyond the scope of the claims on which he was granted leave to proceed against Sheward. *See* ECF 47 at 4.

3

There is also a dispute about whether Davis had a medically prescribed gluten-free diet at this time. In response to a Request for Health Care on June 25, 2015, a "Health Care staff"[2] wrote to Davis, "Gluten diet order good until 7/22/15. Custody & Aramark notified." ECF 182-3 at 17 and 30. Sheward contradicts that in his declaration where he affirms, "Prior to July 7, 2015, the medical department had not provided an approved non-formulary order for a gluten free diet for Mr. Davis." ECF 171-1 at 4. Both of those are contradicted by Health Services Administrator DeAngela Boyan who, in response to a grievance filed by Davis complaining about not getting a gluten-free diet from June 18, 2015, to July 9, 2015, wrote on July 17, 2015, "Mr. Davis does not have a medical order for a gluten free diet." ECF 182-3 at 26; and ECF 182-3 at 23. Construed in the light most favorable to Davis, he had a gluten-free diet order on June 25, 2015, which was valid until July 22, 2015.

In response to Davis' informal grievance which purportedly raised the same concerns, Sheward wrote:

> To: Davis, Sonny, 128888, D7-101
> From: Greg Sheward, GM, Aramark,
> Re: Gluten Ramadan
>
> I will check into your concern to ensure we are providing the correct diet sack.
> Thanks for bringing it to my attention.
>
> Thank you for your inquiry,
> Greg Sheward, GM, Aramark,

ECF 182-3 at 15 (emphasis added).

---

[2] The form is signed, but it is unclear by whom.

In that response, Sheward recognized Davis was requesting not only a gluten-free diet, but one that complied with his religious beliefs as well. Davis does not dispute Sheward's explanation that combining two such diets creates a non-formulary diet; one that is not a standard diet. "A non-formulary diet order is required in cases in which an inmate requests a diet that is not the standard diet issued to all inmates." ECF 171-1 at 4. Though Davis provided evidence disputing when Sheward responded to the informal grievance, he did not provide any disputing what he did.

> Upon receiving information of Davis's diet problems, I immediately contacted medical to obtain the approval for such a diet.[3] I then contacted the registered dietician for Aramark and worked with her to prepare this non-formulary diet, as this is a menu that must be created upon request. I also advised staff on how to prepare this menu, including the appropriate portions for each menu item, and implemented the diet as quickly as possible.

ECF 171-1 at ¶ 19.

The timeline described by Sheward to accomplish this was a day or two. However, because there is a dispute about when Sheward answered the informal grievance, for the purpose of this motion the court must accept that it took two weeks. In the formal grievance (#88171) corresponding to the informal grievance[4] Sheward answered, Davis states he is a Muslim who needs a gluten-free diet for Ramadan. ECF 182-3 at 23. It describes the meals he was being provided and says the only item he was

---

[3] For the purpose of this motion, the court has accepted that Davis already had a medically prescribed gluten-free diet order. However, that is not inconsistent with Sheward contacting medical to verify they approved.

[4] A copy of the informal grievance was not filed with the summary judgment briefs – nor is there a citation for where it might be found elsewhere in the record.

5

unable to eat were cookies because they contained gluten. Otherwise, the other food he received was gluten-free. Thus, during those fourteen days, from June 24, 2015, through July 8, 2015, Davis was without the calories from cookies.

The question before the court is whether this is adequate evidence for a reasonable jury to find that Sheward was deliberately indifferent to an objectively serious health issue.

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Williams v. Shah*, 927 F.3d 476, 480 (7th Cir. 2019) *quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The facts viewed most favorably to Davis show that Sheward worked with the medical department, a registered dietician, and Aramark staff to approve, design, and create the requested diet plan, but it took him fourteen days to do so. During that time, Davis was deprived of the calories he would have received from cookies because they contained gluten. Otherwise, the other food he received was gluten-free. No reasonable jury could find for Davis on this claim. There is no evidence that the reduced caloric intake from missing cookies posed an excessive risk to Davis' health such that a fourteen day delay in correcting the diet being served could be plausibly inferred to be deliberate indifference. Therefore, the summary judgment motion will be granted as to the gluten-free diet claim.

6

### B. Spoiled and Insufficient Quantities of Food Claim

Davis was also granted leave to proceed on a claim against Sheward for serving him spoiled and insufficient quantities of food from July 14, 2015, until January 2016. ECF 47 at 4. However, his response to the summary judgment motion narrows those dates. "Plaintiff was out to court from July 16, 2015, until July 30, 2015." ECF 182-1 at 3, *see also* ECF 182-3 at 38-40. Davis also clarifies the last time he raised a concern with Sheward about his food was a grievance filed December 16, 2015, which was answered January 5, 2016. ECF 182-3 at 3 and ECF 182-3 at 158. Therefore, the relevant dates for this claim are July 14, 2015, to July 15, 2015, for being served an insufficient amount of food[5] – and from July 31, 2015, to January 5, 2016, for frequently being served spoiled and insufficient quantities of food.[6] ECF 182-1 at 3, ECF 182-1 at 9, and ECF 182-3 at 38-40.

### 1. Insufficient Quantify of Food on July 14 & 15, 2015

It is undisputed Sheward responded on July 17, 2015, to an informal grievance[7] from Davis complaining about receiving an insufficient quantity of food. ECF 182-3 at

---

[5] Davis also argues he received insufficient amounts of food from July 8, 2015, through July 13, 2015. However, that is beyond the scope of the claims on which he was granted leave to proceed against Sheward. *See* ECF 47 at 4.

[6] Davis argues he was frequently served food with gluten from July 31, 2015, to January 5, 2016. ECF 182-1 at 3. However, that is beyond the scope of the claims on which he was granted leave to proceed against Sheward. *See* ECF 47 at 4.

[7] A copy of the informal grievance to which Sheward responded on July 17, 2015, was not filed with the summary judgment briefs – nor is there a citation for where it might be found elsewhere in the record.

35. Sheward wrote, "I did verify those making the Ramadan sacks had the proper menu and covered it with both the supervisor and worker. When I spot checked the sacks they were made correctly by the sack menu." *Id*. Whether Davis received properly made sacks on July 14 and 15, 2015, is a disputed issue of fact. In his affidavit and brief, Davis is vague about what was missing on those days. However, he provides no evidence to contradict Sheward's description of what was written in the informal grievance. "The sack you are explaining is missing 1 fruit and 1 vegetable. We did not receive any notification on any issues, as they would have been easily corrected for those items. I will check into it again today." ECF 182-3 at 35. Davis argues Sheward could not have checked his Ramadan sack on July 17, 2015, because Ramadan ended on July 16 and because he was out to court and did not receive meals that day. ECF 182-1 at 3. Thus, what Sheward did to follow-up on the July 17 is also a disputed fact.

The question before the court is whether this is adequate evidence for a reasonable jury to find that Sheward was deliberately indifferent to an objectively serious health issue.

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Williams v. Shah*, 927 F.3d 476, 480 (7th Cir. 2019) *quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The facts viewed most favorably to Davis show his sacks were improperly made on July 14 and 15 because they were missing one fruit and one vegetable.

8

Sheward learned about these errors after they happened. He said he would follow-up, but could not because Davis had left the prison. No reasonable jury could find for Davis on this claim. There is no evidence Sheward knew the sack meals were missing food until after it had happened. Moreover, even if he had known, there is no evidence that missing these fruits and vegetables posed an excessive risk to Davis' health such that a two day delay in correcting the meals was deliberately indifferent. Therefore, the summary judgment motion will be granted as to the July 14-15, 2015, insufficient quantity of food claim.

2. Spoiled and Insufficient Quantity of Food from July 31, 2015 to January 5, 2016

Davis argues, "[a]fter returning from court on July 30, 2015, almost every meal the Plaintiff received either was missing food . . . or was spoiled . . .." ECF 182-1 at 3. He declares in his affidavit, "I submitted multiple informal grievances to Greg Sheward between the date of August 1, 2015, through December 17, 2015[, and] had my mother call Greg Sheward several time[s ] and was on the phone while they talked." ECF 182-3 at 3. He argues, Sheward "spoke with the Plaintiff's mother on several occasions regarding his diet during the period in question." ECF 182-1 at 9.

Sheward affirmed in his declaration, that after July 15, 2015, "I have had no further involvement with Mr. Davis or his dietary needs or concerns." ECF 171-1 at 5. In his supplemental declaration, he amends that to say he had no further involvement other than responding to an informal grievance from Davis on January 5, 2017. ECF 187-1, *see also* ECF 182-3 at 158. However, he affirms, "I have no knowledge of spoiled food

9

being served to him [and] I never spoke to any of Mr. Davis's family regarding dietary issues." ECF 187-1 at 2-3.

These contradictory facts viewed most favorably to Davis show he sent numerous informal grievances to Sheward complaining about being served spoiled and insufficient quantities of food from July 31, 2015, to December 17, 2015, and that Davis listened while his mother spoke to Sheward on the phone several times about these problems. The question before the court is whether these facts could be is adequate for a reasonable jury to find Sheward was deliberately indifferent to an objectively serious health issue.

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Williams v. Shah*, 927 F.3d 476, 480 (7th Cir. 2019) *quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Without more detail about what food was spoiled, why he believed it was spoiled, as well as what (and how frequently) food was missing from his meals, a jury might not believe Davis was served spoiled and insufficient quantities of food frequently enough from July 31, 2015, to January 5, 2016, to constitute an excessive risk to his health. So too, without more detail about when and what Davis (and his mother) told Sheward, a jury might not believe Sheward had actual knowledge he was

10

frequently served spoiled and insufficient quantities of food.[8] However, given the record presented, summary judgment must be denied.

Sheward argues Davis cannot produce evidence showing the food he received was either spoiled or of insufficient quantity. ECF 170 at 15. He affirms in his declaration, "[t]o my knowledge, the meals at Westville are consistent with the meals identified by the IDOC under the Contract[,] approved by IDOC[,] reviewed and approved by registered dieticians[,] meet the nutritional guidelines of the American Correctional Association[,] and provide inmates with approximately 2500-2800 calories. ECF 171-1 at 1-2. In one of his grievances, Davis wrote, "what Aramark provides is not enough, it is only the basic calories . . .." ECF 1-1 at 38. Sheward is correct that if Davis is asserting a basic 2500-2800 calorie diet is insufficient, no reasonable jury could find for him. However, that is not the claim which survives summary judgment. The claim is Davis received enough fewer calories, frequently enough, and for long enough that it posed an extreme risk to his health.

Sheward argues Davis does not have any expert testimony showing he was "not provided with a nutritionally adequate diet or that the diet caused his alleged injury." ECF 170 at 15. However, Davis does not need an expert to testify to his personal observations and experiences. So too, no expert is required to testify about the inherent consequences of regularly being denied an adequate quantity of unspoiled food for a prolonged period of time. Davis asserts on September 11, 2015, he was not served vegetables, chips, or jelly which should have been included with his meal. ECF 182-3 at

---

[8] As previously noted in footnote 4, Davis mentions being served meals with gluten during this time, but that is beyond the scope of this claim against Sheward and is therefore not relevant to whether he was served spoiled and insufficient quantities of food.

11

43. He asserts two correctional officers also witnessed him have spoiled food. "Rotten potatoes and meat. Potatoes so black and spoiled it smelled of bleach." ECF 1-1 at 68. He asserts, two officers photographed his tray on October 4, 2015, because it was short of food. ECF 1-1 at 68. No jury could find for Davis based on only 3 isolated instances over five months, but Davis asserts, "[t]his probably happens almost every day." ECF 1-1 at 71. On October 8, 2015, he wrote, "I have not received any more spoiled food[, but] my trays continue to be short . . . it's as if almost every tray is missing something or is skimpy." ECF 1-1 at 74. As noted, this testimony is vague and may be insufficient for a jury to find the quantity of food served to Davis posed an excessive risk to his health. However, based on the record presented, that is a question that cannot be resolved at summary judgment.

## II. CLAIMS AGAINST DR. ANDREW LIAW

When the amended complaint was screened pursuant to 28 U.S.C. § 1915A, Davis was granted leave to proceed "against Dr. Liaw in his individual capacity [on two claims for compensatory and punitive damages [(1)] for cancelling his medically prescribed gluten-free diet and [(2) for] being deliberately indifferent to the treatment of his pain and open wounds from January to October 2016 in violation of the Eighth Amendment . . .." ECF 47 at 4. For medical professionals to be held liable for deliberate indifference to a serious medical need, they must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008).

A. Gluten-Free Diet Cancellation Claim

It is undisputed Davis' gluten-free diet was cancelled. Davis alleges Dr. Liaw was the one who cancelled the diet because "[f]rom April 17, 2015, through October of 2016 I was not seen by any other doctor except Dr. Liaw." ECF 182-3 at 3. However, it is undisputed Dr. Liaw was not the only physician at Westville at that time. "There was another doctor, Dr. Amjad Shihadeh, who also saw patients." ECF 174-1 at 1. Dr. Liaw states in his affidavit, "I did not discontinue Mr. Davis' gluten-free diet; Dr. Shihadeh did as shown by the medical records that list Dr. Shihadeh as the 'provider' at the end." ECF 174-1 at 2. Dr. Shihadeh may not have seen Davis, but the medical record shows it was he, and not Dr. Liaw, who cancelled the gluten-free diet. ECF 174-1 at 16-17. The parties dispute why it was cancelled and whether it should have been, but those questions are not relevant to resolving this claim. The undisputed evidence shows Dr. Liaw did not cancel the gluten-free diet. No reasonable jury could find for Davis on this claim, therefore summary judgment will be granted as to the gluten-free diet cancellation claim.

B. Deliberate Indifference to Pain and Open Wounds Claim

Davis was granted leave to proceed on a claim against Dr. Liaw for being deliberately indifferent to the treatment of his pain and open wounds from January to October 2016. ECF 47 at 4. Davis declares in his affidavit, "[i]n January of 2016, February 2016, and March of 2016, I showed Dr. Liaw the sores were spreading and getting worse. I also informed him of the cramps, body and muscle pains, headaches

13

and jello like stool as a result of being forced to eat food with gluten in it. He refused to act and ignored my complaints." ECF 182-3 at 5. This conflicts with the medical record where on April 22, 2015, a nurse recorded Davis told her the "rash started about 2 days ago but has increased today and open sores appeared today." ECF 174-2 at 42. It also conflicts with Dr. Liaw's affidavit where he states, "[w]hen nursing staff contacted me on April 22, 2016, this was my first knowledge that Mr. Davis was having any discomfort from a rash or wounds in the year 2016." ECF 174-1 at 3.

These are genuine disputed facts. Construed most favorably to Davis, they show he spoke to Dr. Liaw in January, February, and March 2016. He showed Dr. Liaw sores which became progressively worse each month. He told Dr. Liaw he was in pain and had various symptoms. Davis points to no medical records, grievances, requests for healthcare, or any other evidence which corroborate his testimony. Nevertheless, if a jury believed him and disbelieved the conflicting testimony, it could find Dr. Liaw acted outside the range of accepted professional judgment, practice, or standards by ignoring Davis' repeated requests to treat his sores from January to April 21, 2016. Therefore, summary judgment must be denied on this claim for that timeframe.

Davis argues Dr. Liaw was also deliberately indifferent for not prescribing him a gluten-free diet during this timeframe. However, it is undisputed that test results on January 1, 2016, showed he did not have a gluten allergy. ECF 174-1 at 54. The results of the RAST gluten sensitivity test he took are reported on a seven point scale (from 0 to 6) showing the severity of the reaction. *Id*. His results showed he had a "0" reaction level.

14

*Id*. Based on that recent test, no reasonable jury could find Dr. Liaw acted outside of accepted professional judgment to not prescribe him a gluten-free diet.

It is undisputed Dr. Liaw examined Davis on April 22, 2016, ordered "nursing staff to clean the infected areas with a mild antiseptic soap and water," and prescribed Benadryl (an antihistamine), two injections of Rocephin (an antibiotic), and Keflex (an oral antibiotic). ECF 174-1 at 3, *see also* ECF 174-2 at 47-50. Davis argues Dr. Liaw falsely wrote that Davis reported his boils were improving. ECF 182-1 at 12, *see also* ECF 182-3 at 183. This is a dispute, but whether his condition was improving before Dr. Liaw saw him is not relevant to whether Dr. Liaw's response was otherwise within the range of professional judgment. Davis argues a nurse's note seven hours later shows he was getting worse. ECF 182-1 at 12, *see also* 174-2 at 49. However, his condition seven hours later is not proof of his condition when Dr. Liaw saw him. Davis has presented no evidence Dr. Liaw's response on April 22 was inappropriate or that it would have been different absent a belief the boils had improved.

On May 8, 2016, Davis sent a Request for Health Care saying he believed he had MRSA. ECF 182-3 at 108. "MRSA stands for methicillin-resistant Staphylococcus aureus. It causes a staph infection (pronounced 'staff infection') that is resistant to several common antibiotics." U.S. Nat'l Libr. of Med., https://medlineplus.gov/mrsa.html. When Dr. Liaw was notified the next day, he moved Davis to the infirmary and examined him. ECF 174-1 at 3. Davis remained in the infirmary until May 15, 2016. ECF 174-1 at 57-107. While there, he was tested for MRSA and prescribed IV antibiotics, Motrin, Tylenol, and Benadryl. *Id*. On May 14, 2016, test results showed Davis was

15

positive for MRSA. ECF 174-2 at 97. Davis argues he should have been seen sooner and Dr. Liaw was wrong to have told him he had boils. ECF 182-3 at 3 and 108. However, Davis has provided no evidence or explanation showing how Dr. Liaw could have known he had MRSA before the worsened skin condition was reported. According to the Centers for Disease Control and Prevention, "You cannot tell by looking if it is a serious staph or MRSA infection [because] MRSA skin infections often appear as wounds or boils . . .." https://www.cdc.gov/mrsa/community/photos/index.html.

While in the infirmary on May 9, 2016, Davis told Dr. Liaw the sores were caused by his eating gluten. ECF 182-3 at 3, *see also* ECF 182-3 at 124 and 126. However, as previously noted, the RAST test had recently shown he did not have a gluten allergy. Davis has provided no evidence to show Dr. Liaw acted outside of accepted professional judgment in believing he did not have a gluten allergy. Therefore, no reasonable jury could find Dr. Liaw acted improperly when he renewed a regular diet on May 10, 2016. ECF 174-2 at 56.

On July 18, 2016, Dr. Liaw prescribed Bactrim[9] for ten days. ECF 182-3 at 206. Davis argues Dr. Liaw wrote this prescription because he was eating gluten, but he provides no evidence supporting this theory. As previously noted, the RAST test showed he was not allergic to gluten. There is no evidence Dr. Liaw prescribed Bactrim because Davis was eating gluten. Neither is there any evidence this medicine was improperly prescribed.

---

[9] "BACTRIM . . . is a synthetic antibacterial . . .." United States Food and Drug Administration, https://www.accessdata.fda.gov/drugsatfda_docs/label/2003/17377slr057_Bactrim_lbl.pdf.

16

On August 28, 2016, Davis reported "extreme breakouts/infections MRSA, I have a very big boil on my upper back/shoulder . . .." ECF 174-2 at 129. In response, Dr. Liaw prescribed Bactrim and Tylenol #3. ECF 174-1 at 3-4, ECF 174-2 at 140, and ECF 182-3 at 208. Also,

> [d]ue to his recent rash, and out of an abundance of caution about the rash possibly being related to a gluten allergy/sensitivity, which is what Mr. Davis thought, I agreed to order a gluten-free diet. I also ordered a gluten antibody test, which was a more sensitive test than the RAST test previously performed.

ECF 174-1 at 3, *see also* ECF 174-1 at 55 and ECF 174-2 at 139. Davis argues his condition was mis-characterized as a "rash" in medical records. This is a distinction without a difference. However it was described, Dr. Liaw not only treated his skin condition, he ordered a gluten-free diet and another gluten sensitivity test. Davis has provided no evidence showing Dr. Liaw acted inappropriately on August 28, 2016.

Davis argues the response to his August 28, 2016, Request for Health Care told him a Renal Diet had been ordered. ECF 182-1 at 17, *see* 174-2 at 129. It is unclear who wrote that or why. However, it is undisputed he was prescribed a gluten-free diet by Dr. Liaw on August 30, 2016, which he received at the end of October 2016. ECF 174-2 at 139 and ECF 182-3 at 5. Davis argues it should not have taken nearly two months for the gluten-free diet to begin. ECF 182-3 at 5. It is unclear who or what caused this delay, but he has provided no evidence Dr. Liaw was responsible. Davis has provided no evidence Dr. Liaw acted improperly from August 29, 2016, to the end of October 2016.

17

Davis has provided no evidence from which a reasonable jury could find that Dr. Liaw's treatment of his pain and open wounds from April 22, 2016, to October 2016 was a substantial departure from accepted professional judgment, practice, or standards. Therefore, summary judgment will be granted as to those claims.

### III. CONCLUSION

For these reasons, the court:

(1) GRANTS Greg Sheward's summary judgment motion (ECF 169) to the extent the claim alleges he denied Sonny Davis a gluten-free diet from June 15, 2015, until July 14, 2015, and so is DISMISSED;

(2) DENIES Greg Sheward's summary judgment motion (ECF 169) as to the claim for serving Davis spoiled and insufficient quantities of food from July 31, 2015, until January 2016;

(3) GRANTS Dr. Liaw's summary judgment motion (ECF 173) to the extent the claim alleges he cancelled Davis' medically prescribed gluten-free diet <u>and</u> the claim for being deliberately indifferent to the treatment of his pain and open wounds from April 22, 2016, to October 2016, and so is DISMISSED; and

(4) DENIES Dr. Liaw's summary judgment motion (ECF 173) as to the claim for being deliberately indifferent to the treatment of his pain and open wounds from January 2016, until April 21, 2016.

SO ORDERED on February 17, 2021

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT